Strout et al. *v.* Foster et al.

ORDER.

---

JONATHAN STROUT AND OTHERS, LIBELLANTS, &C., APPELLANTS, *v.* JAMES FOSTER AND OTHERS, CLAIMANTS, AND OWNERS OF THE SHIP LOUISVILLE.

If a ship be at anchor, with no sails set, and in a proper place for anchoring, and another ship, under sail, occasions damage to her, the latter is liable.

But if the place of anchorage be an improper place, the owners of the vessel which is injured must abide the consequences of the misconduct of the master.

In this case, the anchored vessel was in the thoroughfare of the pass of the Mississippi river.

THIS case originated in the District Court of the United States for the eastern district of Louisiana, was carried, by appeal, to the Circuit Court, and finally brought here.

There was much contradictory evidence about some of the facts. Those which were not disputed were these :

The Harriet, a ship of about, three hundred tons, sailed from New Orleans for London on the 25th of May, 1836. On the 26th, she passed the bar of the Southwest pass, at the mouth of the river, and came to anchor. The ship Louisville, of five hundred tons burden or upwards, was coming in, and a collision ensued between the two vessels. The Harriet was so much damaged that she put back for repairs. Her owners, Jonathan Strout and others, libelled the Louisville. The District Court, after a hearing, decreed in favour of the libellants, and against the ship Louisville, her tackle, apparel, and furniture, in the sum of $2701 07, and costs of suit. The defendants appealed.

The Circuit Court reversed the decree of the District Court, with costs; and remanded the case to the District Court, with instructions to dismiss the libel. The libellants appealed.

It was given in evidence on the trial below for the libellants, that, on the 26th of May, 1836, the Harriet was at anchor near the mouth of the Southwest pass of the Mississippi, outside the bar, on the western side of it, with her sails all furled; that the Louisville was also lying at anchor with her sails furled, at some considerable distance to the eastward; that the Louisville got under weigh, and stood down to the Southwest pass with all sails set, topsail, and jib, and spanker; that she got within a quarter of a mile of the Harriet, and let go her anchor; that there was no range of cable overhauled; that there was not more than enough cable to let the anchor out of sight; that when the Louisville dropped her anchor, her sails were all set; that she came afoul of the starboard bow of the Harriet, whose helm was hard to starboard, and the jib and fore-top-mast stay-sail set to steer clear; that the people on board of the Harriet bore the Louisville off, and then she came afoul again; that they bore her off again; that instead of the Louisville making sail aft to bring her up, they set the fore-top-sail, and the ship paid off, and came afoul of the Harriet across her bows; that aboard the Harriet they continued to pay out cable, to permit the vessel to go clear; that there was plenty of room for the Louisville to have passed to the eastward of the Harriet, and a good free wind; that the Harriet was lying out of the usual track; that two brigs came down and

went to sea to the eastward of the Harriet, after she had anchored; and that the wind was fresh from the S. E. or S. S. E.

On the part of the defendants, it was given in evidence, that the Harriet might have gone to sea when she anchored, as there was wind enough; that she was lying in the thoroughfare of vessels going in and out; that when the Louisville weighed anchor to come in, there was a fresh wind and favourable for coming in; that as she approached the bar, the wind died away; that a strong current set out of the pass; that it was stronger than usual, in consequence of there having been a strong wind the night before from the south; that owing to the lightness of the wind the Louisville drifted; that there was a pilot on board the Louisville, who said some time before, that they would be obliged to go close to the Harriet on one side or the other; that as the Louisville neared the Harriet, the pilot ordered them to let go the anchor and take in sail; that they obeyed the order as soon as they could; that the anchor got afoul of the chain of the Harriet, which had a great scope out; that the chain of the Harriet was not forward of her, but off on the starboard bow; that the Harriet had met with a similar accident in and about the same place, on a former voyage; that the entrances of passes at the mouth of the Mississippi are very intricate and difficult, on account of the currents and counter-currents; that as vessels approach the bar, and the water becomes more shoal, they are apt to become unmanageable, particularly when the wind dies away; that when the water is shoal, the under-tow has a great effect, and frequently with the greatest efforts a vessel cannot be steered; that there is one flood-tide every twenty-four hours on the bar, and the under-tow is the consequence of the flood-tide setting in and the current out.

The opinion of the Circuit Court, as delivered by Mr. Justice McKINLEY, was as follows:

This case comes before this court upon an appeal from the decree of the District Court for the eastern district of Louisiana.

The appellees, owners of ship Harriet, filed their libel, in the court below, for collision, and upon the trial the court rendered a decree in favour of the libellants, for $2701 7 cents. By the evidence it appears that the Harriet had passed over the bar through one of the passes or outlets at the mouth of the Mississippi river,

outward bound, on the 26th of May, 1836, and came to anchor near the bar.   The Louisville, lying below a distance of several miles, weighed anchor with a fresh and favourable wind for coming in, through the same pass; as she approached the bar the wind died away, and the current being stronger than usual, owing to a strong wind from the south the night before, she drifted and ran afoul of the Harriet.   These passes, it appears, are intricate and difficult to navigate, and subject to counter and under currents.   If the wind die away when a ship is coming in, she is certain to drift and become unmanageable.   Knowing these facts, a prudent master would never anchor his vessel in the thoroughfare of one of these passes.   The evidence shows, however, that the master of the Harriet did anchor his vessel immediately in the thoroughfare, and that, too, after having been run afoul of by another vessel about a year before, at or near the same place.

There are four possibilities under which a collision may occur:

First. It may happen without blame being imputable to either party; as when the loss is occasioned by a storm, or any other *vis major.*   In that case the misfortune must be borne by the party on whom it happens to light, the other not being responsible to him in any degree.

Secondly. When there has been a want of due diligence or skill on both sides, in such case the rule of law is, that the loss must be apportioned between them, as having been occasioned by the fault of both.

Thirdly. It may happen by the misconduct of the suffering party only, and then the rule is, that the sufferer must bear his own burden.

Lastly. It may have been the fault of the ship which run the other down, and in this case, the injured party would be entitled to entire compensation from the other.   The Woodrop Sims, 2 Dodson's Rep. 83.

The third rule here laid down, it seems to me, applies with great force to the case under consideration, the misconduct on the part of the master of the Harriet, in anchoring his ship immediately in the thoroughfare, is fully made out by the proof; while, on the contrary, there is no fault proved, going to show mismanagement, want of skill, or negligence on the part of the master of the Louisville.   It is true that the opinions of some

nautical men, found in the evidence, show that it was possible for the Louisville to have avoided the collision, had every thing been done that it was possible to do.   But the law imposes no such diligence on the party in this case; so far as the Harriet was concerned, the Louisville was entitled to the full use of the thoroughfare of the pass; the master of the Harriet having obstructed it, with a full knowledge of the danger of doing so, has been guilty of such misconduct as to deprive the appellees of the right of action against the appellants.   3 Hunt's Con. 230.

It was insisted by the counsel of the appellees, that the Harriet being at anchor, and the other ship under sail, that the latter was therefore liable.   It is true, if a ship be at anchor, with no sails set and in a proper place for anchoring, and another ship under sail occasions damage to her, the latter is liable.   But the place where the Harriet anchored was an improper place, and therefore the appellees must abide the consequences of the misconduct of the master.   Wherefore, it is decreed and ordered that the decree of the District Court be reversed, and held for naught, and that the appellants recover of the appellees their costs in this behalf expended; and it is further decreed and ordered, that this case be remanded to the District Court, with instructions to dismiss the libel of the libellants.

*Dickins* and *Hellen*, for the appellants.

*Coxe*, for the appellees.

The reporter was not present at the argument, and has been furnished only with the notes of Mr. Dickins.

*Dickins* laid down the following propositions:.

1. The sea is a public highway or thoroughfare, equally free to all persons and all nations.

2. All persons navigating the high seas have an equal right to sail through, or anchor in any portion of them.

3. All persons navigating the high seas, as aforesaid, are bound to take notice of all such vessels as may have come to an anchor; and so to navigate their vessel as not to run afoul of, or otherwise injure those at anchor.

4. If a vessel under sail runs afoul of a vessel at anchor in the nigh seas, the vessel in motion is bound to pay all damages.

5. If the universal right of all vessels navigating the high seas to anchor in any part thereof has been restricted, either by law

or custom, and they are prohibited from coming to an anchor in certain places, unless at their own risk, it is incumbent upon the party claiming the benefit of such restriction or prohibition, to prove its existence clearly and conclusively; and also to prove, with equal clearness and certainty, the fact, that the vessel complained of was anchored in such prohibited place, and that all ordinary diligence was used by those on board of the vessel in motion, to prevent the accident; otherwise, they will not be released from the payment of the damages sustained by the vessel at anchor.

6. The universal right of all persons navigating the high seas to anchor wherever they may happen to be, or in any place they may think proper, has never been and cannot be restricted, but in certain particular local jurisdictions.

7, and last. If a vessel under sail comes unawares upon one at anchor, they are both bound to use every possible exertion to prevent a collision; and if either is deficient in that respect, it is bound to bear the loss: but should a vessel under sail knowingly and voluntarily attempt to pass one at anchor, and, in so doing, run afoul of her, and thereby cause her to sustain loss or damage, the vessel under sail, although she may have used every possible exertion to prevent the damage, but at a time when it was too late to avoid the collision, is bound to pay all the losses sustained in consequence thereof by the vessel at anchor.

In support of the fourth proposition, he cited Jacobsen's Sea Laws, (edition by William Frick, in 1818,) p. 339: "A ship, which, under full sail, occasions damage to another which has no sail set, is liable for all damages."

To sustain the fifth proposition he cited Lock *v.* Seward, 4 Carrington and Payne, 106; and Foot and Reynold *v.* Wiswall, 14 Johns. 304: and for the seventh, Jacobsen's Sea Laws, 107, art. 36; 1 Bell's Comm. 580; Story's Commentaries on Bailments, p. 385; 3 Kent's Com. 230; Story as above, 381, 382; Collinson et al. *v.* Larkins, 3 Taunt. 1; Haggitt *v.* Montgomery, 5 Bos. and Pul. 446; Verplank and another *v.* Miller and another, 1 Moody and Malkin, 69; Yates et al. *v.* Brown et al., 8 Pick. Mass. Rep. 83; Hawkins *v.* Dutchess and Orange Steamboat Company, 2 Wend. 452; Snell, Stagg and Co. *v.* Rich, 1 Johns. 305; Dodson's Admiralty Cases, 471, the case of the Neptune.

That all possible diligence should have been used by the Louisville, he cited Story on Bailments, 334; 3 Pardessus, 79, ¶ 652; 1 Wash. C. C. R. 142; Stone et al. *v.* Retland, 4 Martin's La. Rep. (new series,) 399; Martin et al. *v.* Blythe, 1 McCord, 360.

The court being equally divided, the judgment of the Circuit Court was affirmed.

### ORDER.

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the eastern district of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be and the same is hereby affirmed, with costs.